## JOINT USE OF MUNICIPAL POLES.

[Common Pleas Court of Franklin County.]

The City of Columbus, etc., v. The Columbus Public Service
Company et al.

Decided, March 13, 1906.

*Municipal Corporations—Without Power to Permit Joint Use of City
Poles for Electric Wires—Are Such Poles Personal Property?—
Power of Municipality to Sell or to License Use of Personal Prop-
erty—Jurisdiction of Board·of Public Service over Poles.*

1. The right by a public lighting company to maintain its wires on
   municipal poles can not be acquired by estoppel, where the com-
   pany claiming such right has been charged from the beginning with
   full knowledge that whatever rights it might acquire to the use of
   such poles must be through strict legal contract with the munic-
   ipality.
2. There is an entire absence of express power, either in the municipal
   code or previous statutory provisions, whereby a municipality may
   grant to a lighting company the right to jointly use municipal
   poles; nor can such power be implied from authority to sell either
   real or personal property; and to treat such pole rights as a mere
   license might easily result in confiscation to a degree which would
   exclude the city from larger use demanded by future growth.
3. The fact that public policy and good business judgment favor an
   advantageous contract for the joint use of city poles, furnishes no
   warrant to a court to assist in a continuance of such use, where
   the entering into such a contract is manifestly *ultra vires* on the
   part of the municipality.

DILLON, J.

This action is brought against the Columbus Public Service
Company, a corporation organized for the purpose of furnishing
electric light and water heating to patrons in the city, and also
against the board of public service of the city. The object is
to enjoin the use by the said electric light company of certain
of the city's poles on which they have strung their wires, and
also asks for a mandatory order of the court to compel the re-
moval of such contacts as have already been made. The answers
plead the provisions in two of the franchises of the defendant
light company authorizing such use; also a contract made by

said light company with the board of public service granting such right and privilege; further actions and conduct on the part of the city with the light company amounting in law to an estoppel, and other considerations of policy, economy and necessity.

The discussion of the court of this case will be as brief as possible, and will especially omit discussion of those fundamental and well settled propositions of law with which it assumes all counsel in this case to be familiar, as well as to the authorities; therefore all such propositions will be omitted.

The facts establish that about the time the first franchise was granted to the predecessor of the present public service company, to-wit, on July 17, 1902, the city itself had, in embryotic stage of development the establishment of a municipal light plant, which has since been perfected and is constantly growing and in full operation.   In that original franchise, and as a part thereof, is was provided ''that where said city has erected poles in advance of those to be erected by said company, such poles may be used jointly by the city and said company under reasonable regulations to be adopted by the board of public works of said city.''   By another ordinance granted to a predecessor of the defendant light company, passed August 3, 1903, it was also provided in substance that where the city had already erected poles, such poles might be used jointly by the city and said company under a reasonable contract to be entered into by the board of public service of said city and said company.

No contract of any kind was ever made between the city of Columbus and the said light company until August 9, 1905, which will be referred to later.   In the meantime the light company from time to time, as their business developed, continued to make contacts with the city's poles in various parts of the city, and on May 17, 1904, the board of public service unanimously adopted a resolution that the said Public Service Company (herein referred to always as light company) be notified to remove their wires from the city's poles and place them so as not to interfere with the city's wires, and to follow out the instructions of Superintendent Wilcox of the municipal light plant.   On the same day a letter was mailed to the light company notifying it of this resolution and asking that there would be no

delay in complying therewith. Later, on June 4, 1904, the board passed another resolution, reciting that the said light company be and is hereby required to pay for the use of the city's poles already had, and to remove these wires from the poles at once, "as they were strung thereon without the knowledge and consent of this board, except a few poles on Fifth avenue."

On the same day a copy of this resolution was likewise served upon the light company. On June 6, 1904, the light company answered expressing some surprise to receive a notice of this character, and reciting the fact that Mr. Pond, one of the members of the board, had called the writer up over the telephone and requested him to call at the board's office in relation to the use of the city's poles. This letter further recites the franchise under which they were operating, and their expectation to make an agreement by reason of certain verbal conversations previously had with indivdual members of the board, and reciting further a letter written February 27th, in which the light company had made the proposition that it would furnish the cross-arms and pay the expense of putting them on the city's poles and pay the city fifteen cents per contact each year for all wires strung on the poles. Three days later the light company sent a further communication to the board, saying: "We desire to enter into an arrangement with your board for the joint use of poles. * * * We would be willing to pay fifteen cents per contact, the city paying this company the same. Such contract to be drawn in accordance with and subject to the provisions contained in ordinance granting this company its franchise."

Two months prior to this last letter, to-wit, on April 27, 1904, the city solicitor had rendered a written opinion to the board of public service in which he says that "under no circumstances can you legally lease the city's poles until those poles are erected," and further, "that your board can neither lease the company's poles for the city, nor lease the city's poles to the company, except with the permission and under the direction of council." Said solicitor further stated that he would permit no further contracts. On June 11, 1904, the city solicitor sent a copy of this letter to the public service company informing it that it was the policy of the city that its poles must not be used by private lighting companies except in strict compliance

with the law, and informing the said light company that an action of injunction would be begun unless it would agree to forthwith remove its wires and no longer attempt to use the city's poles.

This communication was answered on June 13, 1904, in which the light company agrees with the statement that the city's poles must not be used by private lighting companies except in strict compliance of law, but claiming that their use is not without a warrant of law, and expressing a willingness to comply with the request not to string wires on any additional poles "until and unless a legal contract shall be entered into by and between this company and the board of public service, and in the event that such contract can not be entered into within a reasonable time, this company will then proceed to erect its own poles and at once remove its wires thereto."

On August 29, 1904, the board of public service adopted a resolution "that all wire-using companies having wires attached on city poles without a contract or consent of the city, be notified to remove said wires by September 15, 1904." Said resolution further provided that after such date the superintendent of the municipal plant was authorized to employ the necessary help and remove the wires. A copy of this resolution was, on the same day, sent to the defendant light company. To this communication the defendant light company, on October 14th, sent a letter. After reciting some of the history of the case, stated that they would as soon as possible, erect such poles as may be necessary to meet the requirements, and until that time it agreed to pay the city the sum of fifteen cents per contact. On May 31, 1905, the situation remaining practically unchanged, the board passed a resolution giving the defendant light company seventy-two hours from the date of the passage of the resolution, to render a statement as to what contacts they already had, and to state whether or not they would within thirty days remove all their wires, and further stating that in the event that such assurance was not given, or, if the assurance being given and it was not carried out, then at the conclusion of thirty days would, without further notice, remove the said wires from the city's poles. This resolution was also served upon said defendant light company.

In reply to this the light company, by letter, said that by rea-
son of the absence of one of their officers they would not be able
to give the information within seventy-two hours, but if the time
be extended until Wednesday of next week, they would be pleased
to furnish the desired information.    On June 7th, this informa-
tion came in the shape of a letter in which, after reciting that
they had occupied the city poles under a tentative and favorable
agreement with the present board of public service, goes on to
state that if the board desired these wires removed, it would re-
quire some time for the defendant company to erect new poles,
and they asked that the board give it a reasonable time for the
reconstruction of its lines, and agreeing that in the meantime
they would pay fifteen cents per contact.    Attached to this letter
was a copy of the contracts, showing five hundred and ninety-
six contacts at various points in the city.    On August 9, 1905,
the board of public service adopted a resolution reciting their
many reasons for so doing, including good business policy and
being for the best interests of the city, and whereby all former
resolutions were rescinded, and it was resolved that this board
enter into a contract with the defendant light company provid-
ing for the joint occupancy of the poles at fifteen cents per con-
tact per year.

Some further evidence has been adduced by the secretary of
the defendant company, by Mr. Pond, one of the former mem-
bers of the board, by Mr. Rubrecht, a former member of the
city law department, tending to show knowledge or acqui-
escence of the contacts which were being made, and also testi-
mony by Mr. Butler, former city solicitor, and Mr. Immel, for-
mer director of the board of public improvements and now a
member of the board of public service, denying any such favor-
able agreement.

From all the evidence adduced the conclusion is irresistible
that so far as the claim is made that the right to maintain these
pole contacts has been established and perfected, or acquired by
estoppel, no such state of facts exists as will sustain it.    The
defendant light company was not only from the beginning
charged with notice and knowledge of the law, but as a matter
of fact, it has not been misled to its disadvantage or prejudice.
Whatever acts it may have done were done with full knowledge

of the risk which it ran and with full, actual knowledge and in full constructive notice that whatever rights it might acquire upon the city poles must come through strict legal contract. Whatever verbal conversations may have been had from to time, and they are quite uncertain and indefinite in character, it recognized to the very last the fact that it must either acquire a legal right by contract with the city or remove its wires.   I do not think counsel expect any further discussion upon this point, and it has not been forcibly urged in the briefs.

The second consideration set forth in the pleadings and also attempted to be given in the evidence, but rejected by the court, pertained to the good policy of the opposed contract.   It was sought to be shown that the presence of two poles on a street where one pole would be suficient, was a great disadvantage to the public and to the city, both practically and from an artistic standpoint.   Of this fact there can be no question whatever, and this court is not prepared to state that it might not be mutually advantageous, both from a financial standpoint to the city as well as to the public generally to have such a contract entered into.   It must, however, be conceded by counsel that the exercise of a power by a municipality can not be increased or diminished by consideration on the part of the court as to the feasibility, desirability, profit, advantage and good policy thereof.   The exercise of discretion lies with those officials of the city charged with that duty, and if the power to exercise that discretion does not exist it can not be aided by a consideration of the advantages which might accrue therefrom.   Therefore, these considerations can not assist the defendant light company as to the exercise of this right.

The remaining question is as to whether or not the proposed contract which the board of public service is about to enter into, is lawful.   This proposed contract, as shown by the resolution quoted above, was entered into after the original petition in this case was filed, and it was rightfully assumed by the defendant company that up to that point no right did exist.   The issue upon this contract is therefore brought before this court by a supplemental petition.   The claim of the city in regard to this contract is that it is based upon two propositions:   First, that the proposed grant or contract is *ultra vires* as to the corporation; sec-

ond, that even if that be one of its corporate powers, compliance with the mandatory requirements of the statute has not been made. As to the question of power in the municipality, I confess that I have not been able to find among the enumerated powers granted to the municipality, either prior to or subsequent to October 22, 1902 (the date of the passage of the present municipal code), any statute giving express authority, nor do I find the power to be necessarily implied from any other express powers which are given. The power granted to the municipality at the time the first franchise in this case was given is found in the Bates' Statutes of 1902, digested as Section 3471-3, and cognate sections under chapter four of title two.

The express power not being given to the municipalities to grant away its pole rights or any private company desiring to use the poles, the question, therefore, remains as to whether or not it is one of the implied powers of the city. The power having been given to the city of Columbus to grant such a franchise permitting electric light companies to occupy its streets, alleys, bridges, etc., to regulate the terms and conditions thereof, the inquiry arises as to whether or not, as one of the powers necessary to be exercised in carrying out the express power thus granted, is embraced in the right to permit a contract for the joint use of poles for that purpose by the city and the said company. In the first place, it must be conceded that the proposition is not usual and certainly not necessary, however much it might be commended. In granting this privilege to a municipal light company the corporation is in fact disposing of a valuable asset of the city. Discuss it as we may, it must be conceded that this is a personal right and privilege having a high pecuniary value. It is not mentioned as one of the things which the city may embrace in its granting of franchises generally for this purpose. It is clear from the evidence here that the right would have to be a very limited one, since the city has but one extra arm left upon its poles for such use in the future and has not developed its plant yet to its full capacity. It is more evident that the poles are totally insufficient for the uses which the city already sees ahead of it. It would seem, therefore, that since this is not one of those rights which the city must exercise as being necessarily or clearly implied in the exercise of a power expressly

granted, it is, as claimed by counsel for the city, an act *ultra vires*.

But, passing to the second proposition; that is to say, assuming this to be one of the powers which the city may exercise, how shall it be done? What safeguards and limitations have been put upon the city in thus disposing of its property? What legal requisites are necessary in order to accomplish such a proposition? It must be remembered that the provisions of this franchise merely contemplate in the one instance that such poles might be used jointly "under reasonable regulations *to be* adopted by the city," and in the other case, under a reasonable contract *to be* entered into. In accepting this franchise, therefore, the defendant light company knew that it had a further step to take before it would have such a right, and that was to make a reasonable contract with the city, and this means, of course, a contract made according to law. With the contention that these provisions in the franchises were material inducements to the acceptance of the same by the light company, and to this expenditure of money under it, I can see that the reading of the entire franchise relegates these provisions to a very small and unimportant sphere. I believe that it is shown by the evidence, indeed, that the value of all these contracts as proposed to be contracted for would only net ninety dollars a year, and a reading of the franchises in full show that the main purposes so overshadow this one provision, even though it be held illegal, that it could not be claimed that it was one of the material inducements. Indeed, the regulations in the franchises as to poles show that the defendant light company must have contemplated that this provision was purely tentative and might not be entered into at all. Moreover, it is not compulsory upon the city to enter into such a contract, and if the city could not agree as to what was a reasonable regulation, the contract or provision would doubtless fail for uncertainty and lack of remedy, or indefiniteness, since the court would not substitute its discretion for that of the officers of the city as to what would be a satisfactory and reasonable regulation.

To make the proposed contract, authority must be gathered from the code, and seems to be regulated under Sections 23 to 27 thereof. It is provided by Section 23 that a municipal cor-

poration shall have the power to sell or lease real estate which was not needed for municipal purpose, and the same provision expressly limits the *jus disponedi* of personal property to a *sale* thereof, no provision whatever being made whereby personal property of the corporation which is not needed for a municipal purpose can be sold, except as therein provided. From the evidence before this court, assuming that this court might pass upon the feature, it is quite evident that the municipality has need of this very personal property, but that being a matter which is probably within the discretion, of the city, there is the question before this court as to whether or not this proposed privilege and right is personal property.

The right and privilege to use the city's poles by making a contact therewith by means of wires must come under one or the other head of real or personal property. A pole is not a street or part thereof, or a means of travel and communication, as that expression is used with reference to the use of streets. It is not one of the original purposes for which streets were laid out and dedicated, as has been held by our own Supreme Court. If it be a mere license to make a contact with the city's poles, as is contended, we would have the strange result logically following that the exercise of a mere license could easily result in the complete confiscation and use of the entire property itself. If the pole had room for thirty contacts, and these thirty contacts were given to the defendant light company, the city has totally lost from itself a piece of personal property which was erected at a cost to itself and having value. The term "personal property" is very broad, and if we grant, as it seems to me we must, that these poles are personal property, the use thereof is a granting of such property by the corporation, and this, it seems to me, follows as conclusively as if it should decide to attempt to lease one of its ladders or one of its horses. The theory of the statute is that the city shall not enter into any such business; that if it has no use for any such personal property its duty is to sell it. To permit any other theory would permit the city to carry on such leasing business indefinitely.

It is provided by Section 25 of said code, that any personal property not needed for municipal purposes may be sold by the board or officer having supervision of the same. No attempt

to sell has been made or is threatened in this case, and, therefore, discussion as to this section and as to the value of the property involved, and as to whether or not it must be advertised, need not be made. The distinguishment, therefore, between the use of the city's poles and the use of streets must, as I see this case, be the same as the leasing of personal property and the use of streets.

A number of minor points have arisen in the case and I do not think it is necessary to discuss the point that no injury can come to the city through the joint use of the poles. On the contract I am content to say that circumstances might very often arise when the city and public generally would be greatly benefited, and that may be true in this case. Nor is this a question as to whether or not property owners might complain of the joint use of poles. The board of public service certainly has jurisdiction and power over the use of its own poles, and certainly has power to contract for all such purposes and uses which are necessary for it to carry out the express power granted it in maintaining this municipal light plant, but in so doing I can not concede the doctrine to be that they may at the same time dispose of its own personal property, which involves an entirely different question, even though in thus disposing of its personal property some advantage incidentally accrues to it in the exercise of its express power. Nor is this proposed contract a sale. If it were, the title would absolutely pass from the city. If the city, through its officers, should attempt to sell outright a part of its personal property, a question might be presented here, which, in this case, need not be discussed, but, concluding as I have, that the board of public service has attempted to enter into a contract to lease a portion of its personal property, the statutes (Sections 23, 24 and 25) apply.

An entry may be drawn enjoining the consummation of the proposed contract and also a mandatory order will be granted as prayed for. The time for compliance with the mandatory feature of the order will be such as will be perfectly reasonable in view of the particular business of the defendant light company, and the dependence of its patrons for proper service, and therefore, if counsel can not agree upon what is a reasonable time, the court under all the exigencies of the case will fix it.

This time will depend, of course, upon the number of contacts which have to be changed and the erection of poles, and so forth, and will be such length of time as will be reasonable under all the circumstances, and not be destructive. The appeal bond in this case will be fixed at five hundred dollars.

A suggestion was made by one of counsel for further oral argument in this case, but I have felt that the briefs covered the case amply and the very urgent insistence and demand for the time of the court in the other cases is such that I have deemed it no injustice to decide the case without further oral argument.

*Butler, Marshall & Keating*, for plaintiff.

*Sater & Sater, Thomas H. Clark* and *J. K. Henry*, for defendant.